## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ANNELIESE EMERSON, on behalf of herself and all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>SENTRY LIFE INSURANCE COMPANY,<br><br>          Defendant. | Civil Action No.:  18-cv-379<br><br><br>**CLASS ACTION**<br>**COMPLAINT** _____<br><br><br>**JURY TRIAL DEMANDED** |

1.     Plaintiff Anneliese Emerson ("Emerson" or "Plaintiff"), by and through her undersigned counsel, brings this lawsuit on behalf of herself and all others similarly situated against Sentry Life Insurance Company ("Sentry"). Plaintiff alleges as follows based on personal knowledge concerning all facts related to herself, and on information and belief concerning all other matters.

### NATURE OF THE ACTION

2.     This case arises from Sentry's breach of express and implied contractual obligations contained in its universal life insurance policies, a type of life insurance generally offering more flexibility than traditional "term" and "whole" policies. Under a universal life insurance policy, a policyholder will deposit premiums into an accumulation account. In turn, a life insurance company, like Sentry, will withdraw a monthly deduction from each policyholder's account and deposit a separate amount of interest. Interest accrues on the account's balance based upon minimum rates and average annual rates guaranteed by each policy. Universal life insurance policies allow policyholders to alter the amount and frequency of

1

their premium payments so long as their accumulation account contains sufficient value to cover the monthly deduction charge.

3.    In the late 1980s and early 1990s, Sentry sold hundreds of millions of dollars in universal life insurance policies under which it agreed to credit interest on policyholders' accounts at guaranteed annual rates generally ranging between 4.0% and 5.5%.[1] Plaintiff and the other Class members (as defined below) purchased these Policies so that they and their families would be protected as they entered their senior years and in the event of death. But, beginning in or around 2012, Sentry suddenly, unilaterally, and massively began increasing monthly deductions, in particular the Cost of Insurance ("COI"), withdrawn from the Policies' accumulation accounts. Although the policy only permitted changes to the COI only due to changes in Sentry's "expectations as to future mortality experience," the true reasons for imposing the drastic increases were to: (a) subsidize Sentry's cost of meeting its interest rate guarantees under the Policies; (b) recoup past losses and increase its profits; and (c) wrongfully induce policy forfeiture of death benefits by primarily elderly policyholders.

4.    By violating its contractual duties, Sentry was able to enrich itself at the expense of its policyholders, either by charging those policyholders higher premiums or higher costs, which often caused policyholders to be unable or unwilling to pay the higher costs. In those cases, Sentry also would benefit because the Policies would lapse, eliminating Sentry's exposure on the Policies while enabling Sentry to keep for itself years' worth of the premiums that the policyholders had already paid. Sentry often did this just as the policyholders were approaching the age when they most needed the Policies.

---

[1] Plaintiff does not allege any claim premised on deception at the time of sale of the Policies or any other pre-sale conduct by Sentry; Plaintiff's claims are instead exclusively premised on Sentry's actions in imposing increased premiums, monthly deductions, Cost of Insurance, Mortality Charge, and Mortality Rates.

5.    As a result of Sentry's actions, thousands of class members were and continue to be faced with an impossible choice: either pay exorbitant and improper increases that cannot be justified by the ultimate death benefits of the Policies and that violate the Policies, or surrender the Policies and walk away from years of premium payments.

6.    As described more fully below, Sentry's sudden and unilateral increase in the monthly deduction charges and premium increases breached of its contractual obligations. Plaintiff seeks injunctive and equitable relief, as well as ancillary damages, to halt and reverse Sentry's massive increase in the monthly deduction that it withdraws from its policyholders' accounts. This increase has already injured Plaintiff and other Class members, and if allowed to proceed, will continue to cause irreparable injury to Plaintiff and other Class members.

## PARTIES

7.    Anneliese Emerson is and, at all relevant times was, a resident of Wisconsin. On January 12, 1984, Emerson purchased a term life insurance policy with $50,000 of coverage. In May of 1989, however, Emerson converted the term life policy to a "Flexible Premium Adjustable Life Insurance" policy, i.e., a universal life insurance policy. *See* Exhibit A, Flexible Premium Adjustable Life Insurance Policy. Life Between May 12, 1989 and March 16, 2018, Emerson paid a consistent annual premium of $374.15. However, beginning on March 16, 2018—after nearly 30 years—Sentry raised Emerson's premium by almost three times, to $1,075.00. Sentry, over the course of the past five years, has likewise increased a portion of the monthly deduction (which it refers to as the "Cost of Insurance") it withdraws from the cash value of the policy from $46.14 to $76.32. Exhibit B, Universal Life Annual Reports, 2013-18.

8.    Defendant Sentry Life Insurance Company is a Wisconsin corporation with its principal place of business in Stevens Point, Wisconsin. Sentry is authorized to do business in

Wisconsin.

9.     Defendant Sentry Life Insurance Company has no employees of its own and all of its operations are conducted by employees of its parent organization, Sentry Insurance, a Mutual Company, and its affiliates.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Defendant is a citizen of Wisconsin, and at least one class member is a citizen of a different state. The amount in controversy in this action exceeds $5,000,000 and there are more than 100 members in the Class.

11.     This Court has personal jurisdiction over Defendant because Defendant is authorized to conduct business in Wisconsin, is doing business in Wisconsin, is registered with the Wisconsin Secretary of State, and maintains a registered agent in Wisconsin. Defendant resides in and is engaged in systematic and continuous business activity in Wisconsin. Defendant therefore has sufficient minimum contacts in Wisconsin, or otherwise purposefully avails itself of the Wisconsin consumer market through promoting, marketing, distributing, and selling life insurance policies. That purposeful availment renders the exercise of jurisdiction by this Court over Defendant appropriate under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendant regularly conducts business and maintains substantial operations in this District; hundreds, if not thousands, of class members reside in this District; a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this District; and Sentry entered into transactions and received substantial profits in this District.

13.     All conditions precedent to this action have occurred, been performed, or have

been waived.

## FACTUAL ALLEGATIONS

**A.    Universal Life Insurance Policies**

14.    Traditionally, life insurance companies sold two types of policies: term and whole life insurance. Term life insurance is issued for a term of years, normally building up no cash value and expiring without value. Whole life insurance provides coverage for life and provides an increasing cash value that is available when needed. The premiums remain the same throughout the life of the policy.

15.    Universal life insurance, on the other hand, provides more flexibility than whole or term life insurance. Premium payments, which are variable, are deposited in an accumulation account from which monthly cost of insurance and expense charges are deducted. The accumulation account is credited with monthly interest at a nonguaranteed declared rate, but not less than the guaranteed interest rate specified in the policy contract. Universal life insurance policies allow policyholders to change the amount and frequency of premium payments as long as their policy contains sufficient cash value to cover monthly deductions taken.

16.    In 1981, several major life insurance companies entered into the universal life insurance market and by the end of 1983 virtually all major insurers had introduced at least one universal life product. Universal life policies accounted for more than 25% of all individual life-insurance sales for much of the 1980s, when 10-year Treasury yields peaked at 15%.[2]

17.    Consumers in the 1980s and 1990s were attracted to universal life policies because of the historically high interest rates. Calculated premiums were based on optimistic interest rate

---

[2] Leslie Scism, *Retirees Stung by "Universal Life" Cost*, WALL STREET JOURNAL (Aug. 9, 2015), *available* at https://www.wsj.com/articles/cost-of-universal-life-insurance-stings-retirees-1439172119 (last accessed May 15, 2018).

assumptions, most of them guaranteeing at least 4%. High interest rates meant that policyholders did not expect to pay much to fund the policy in their more senior years because the interest would cover future expenses.

18.    Today interest rates are near an all-time low, making it difficult for insurers to credit the rates clients the insurers promised when they sold the policies 20 years ago. As a result, insurance companies are suffering losses due to these universal life insurance policies, and their attempt to fix the problem consists of impermissibly raising the COI charges.

19.    Sentry's Policies use the term "monthly deduction" to refer to the combination of an administrative fee and the COI charge. The latter charge is important to universal life policyholders for at least two reasons: (1) the COI charge is typically the highest expense that a policyholder pays; and (2) the COI charge is deducted from the accumulation account (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to Sentry. Sentry's recent COI increases range from 11% to over 100%, making it impossible for policyholders—especially those at retirement age—to afford their payments and keep the policies in effect.

20.    In the late 1980s, when many of the Policies were issued, the 10-year Treasury rate was around 9%. Throughout the 1990s the 10-year Treasury moved steadily downward, remaining at or above 5% until the post-2001 recession period when it pierced the 4% level for some months. Between 2003 and 2008 it fluctuated generally between 4% and 5%. Since mid-2008, however, the 10-year Treasury has been under 4%, hitting a low of 1.65% in 2012. In April 2012, the Center for Insurance Policy & Research ("CIPR") branch of the National Association of Insurance Commissioners published a report describing the effect on insurers of what was, even then, a prolonged period of low level interest rates. The CIPR Report warned:

Life insurance companies face considerable interest rate risk given their investments in fixed-income securities and their unique liabilities. For life insurance companies, their assets and liabilities are heavily exposed to interest rate movements. Interest rate risk can materialize in various ways, impacting life insurers' earnings, capital and reserves, liquidity and competitiveness. Moreover, the impact of a low interest rate environment depends on the level and type of guarantees offered. Much of the business currently on life insurers' books could be vulnerable to a sustained low interest rate environment . . . .

Life insurers typically derive their profits from the spread between their portfolio earnings and what they credit as interest on insurance policies. During times of persistent low interest rates, life insurers' income from investments might be insufficient to meet contractually guaranteed obligations to policyholders which cannot be lowered. ***

In a low interest rate environment, it is challenging to find relatively low-risk, high-yield, long-duration assets to match annuities that guarantee a minimum annual return (e.g., 4%). For many policies, low interest rates mean that some mismatch with assets is likely. For example, older fixed income insurance products that guarantee rates of around 6%—closely matching or conceivably even surpassing current investment portfolio yields— are likely to put a strain on life insurers as a result of spread compression or possibly negative interest margins.

CIPR Report, at 2-3.

21.    The low interest rate environment has persisted since 2012, exacerbating the spread compression and thus, as explained by the CIPR, undermining the profitability of policies with "guarantee rates around 6%."

22.    A recent report by actuary and Consumer Federation of America's James H. Hunt described how today's "climate of low interest rates" would impact insurers.[3] For more than 30 years Hunt has evaluated life insurance policies. His report prophetically warned:

---

[3] *See Life Insurance Regulators Should Block Cost of Insurance Rate Increases When Used to Avoid Guaranteed Interest Rates in Universal Life Policies, James Hunt,* found at http://www.consumerfed.org/pdfs/160121_CFACOIs_report.pdf (last accessed May 16, 2018).

> While there has been occasional COI increases in the past, and
> there has been litigation on the issue, CFA is concerned that the
> actions taken may spread throughout the life insurance business . . .
> . We are concerned that COI rate increases will, in effect, void the
> interest rate guarantees in affected contracts The question is: Are
> these insurers in a climate of low interest rates using COI increases
> to maintain profits when the interest rates they have been crediting
> to cash values have been reduced to the contractually guaranteed
> rates, often 4%, sometimes higher?

*Id.* at 1.

23.     As Hunt predicted, the low interest rate environment undermined the profitability of policies with guaranteed rates at 4% or more, and in turn Sentry is "using COI increases to maintain profits."

24.     Through dramatic monthly deduction increases taken from the policyholders' cash value, Sentry is seeking to offset or subsidize its credited interest guarantees. Sentry also is seeking to recoup past losses through the increases. In short, Sentry is denying policyholders their contractual benefits under the policies and impermissibly attempting to offset or subsidize its credited interest guarantees.

**B.      Sentry's Standardized Policy Terms**

25.     Plaintiff brings this class action on behalf of herself and other owners and former owners of universal life insurance policies issued by Sentry.[4] The Policies use standardized, materially uniform language with respect to the policy provisions at issue in this action.

26.     Under the uniform provisions of the Policies, an account is established for each Policy into which the policyholder's premium payment(s) are deposited. This accumulation account —referred to in the Policies as the "Cash Value" of the policy—earns interest at a declared interest rate not less than the guaranteed interest rate specified in the Policy.

---

[4] The Policies include policies issued by Sentry that share comparable terms and for which Sentry has unilaterally increased monthly deductions since 2012.

27.     Plaintiff's Policy provides for a guaranteed effective annual interest rate of 5% on the Cash Value of the policy.

28.     Sentry's universal life policies typically guarantee between 4% and 5.5% effective annual interest on the Cash Value.

29.     At the end of each policy month, Sentry withdraws a monthly deduction from the Policy's Cash Value. The monthly deduction is equal to the sum of (1) "the cost of insurance for this policy and any additional benefits provided by rider for the policy month" and (2) "a $5 administrative fee." Exhibit A at 11. Thus, the higher the COI, the more Sentry deducts from the cash value of the account.

30.     The Cost of Insurance is calculated as "(1) multiplied by the result of (2) minus (3), where: (1) is the mortality charge . . . ; (2) is the death benefit at the beginning of the policy month divided by 1.0040741; and (3) is the cash value at the beginning of the policy month, less the administrative fee for that policy month and less the cost of insurance for any riders." Exhibit A at 11.

31.     While the COI can fluctuate modestly as a result of (3), the cash value at the beginning of the policy month, the only way Sentry could change the COI (permissibly or impermissibly) is by changing the "mortality charge."

32.     The mortality charge is by far the most important component of the monthly deduction. Even small changes in the mortality charge can produce a dramatic increase in the dollar amount of the monthly deduction charged by Sentry, particularly for elderly insureds. The higher the monthly deduction, the greater the premiums required to maintain a positive cash value and avoid a lapse of the policy.

33.     Importantly, the contract defines "mortality charge," stating:

> The monthly mortality charge is based on our current mortality rates. The current mortality rates for the policy are based on the *insured's* attained *age*, sex and mortality class. We will determine the current mortality rates based on our expectations as to future mortality experience. Any change in mortality rates will apply to all *insureds* of the same mortality class. In no case will mortality rates for an *insured* in a standard mortality class ever be greater than those shown in the Table of Guaranteed Maximum Mortality Rates in this Policy. Such guaranteed rates are based on the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table, Age Last Birthday. . . .

Exhibit A at 12 (italics in original).

34.    Additionally, the Policies are "nonparticipating," meaning they do "not share in any of [Sentry's] profit or surplus." Exhibit A at 5. By that same token, because the benefits of the policies are not contingent on Sentry's prior performance, Sentry cannot pass or offset its past losses onto its policyholders.

35.    Under the Policies, Sentry's discretion to set or increase the monthly deduction, COI, and/or mortality charge is therefore constrained by Sentry's "expectations as to future mortality experience" and the ceiling rates set in the Tables of Guaranteed Monthly Deduction Rates. Furthermore, the Policies do not authorize Sentry to do any of the following:

- Set or increase the COI in whatever amount or by whatever method it determines;

- Set or increase the COI to recoup past losses, including past losses on the Policies based on changes in interest rates, policy lapse rates, or other experience factors;

- Set or increase the COI to recoup losses due to diminished returns on Sentry's general investment portfolio; and

- Set or increase the COI to negate or offset Sentry's obligation to pay credited interest to the Policies at the minimum guaranteed rates.

36.    While the language states that the mortality rate was originally set using age, sex, and mortality class (whether or not the insured is a smoker), it states that Sentry *"will determine"*

rates based on "expectations as to future mortality experience." Thus any changes to the mortality rate must be tied to Sentry's expectations as to future mortality experience (which is, in any case, informed by age, sex, and mortality class).

37.    A reasonable Policyholder would construe the standardized Policy language to mean that the COI, which is premised on the purported mortality charge and the 1980 CSO Mortality Tables, would not change except for a verifiable, material adverse change in the underlying mortality rates used to price the Policies. As reflected in every subsequent version of the CSO Mortality Tables, mortality rates have only improved in the years since the Policies were issued.

38.    A reasonable Policyholder would also construe (1) the Policies' provisions governing the payment of guaranteed interest on the Cash Value, and (2) the Policies' provisions governing the monthly deduction, as operating independently of one another, thereby precluding Sentry from offsetting or subsidizing its interest obligations through increases in the monthly deduction, COI, or mortality charge.

39.    In the alternative, the Policies are at a minimum ambiguous with respect to whether Sentry can increase the Monthly Deduction for any reason other than an adverse change in the pricing mortality rates. As a result, any ambiguity in that respect must be construed against Sentry and in favor of the policyholders.

## C.    Sentry's Massive Monthly Deduction Rate and Premium Increases Are Wholly Unrelated to Changes in Future Expectations as to Future Mortality Experience

40.    Contrary to the express terms of the Sentry Policies, the increases in the amounts Sentry monthly deducted for the COI were wholly unrelated to changes in future expectations regarding mortality.

41.    The life expectancies of the general population and, most probably, the insured,

have increased rather than decreased. Such an increase in mortality *decreases* Sentry's cost of insurance because Sentry can continue to deduct from, and insureds will continue to contribute to, the cash value of Policies for a longer period of time. This amounts to a windfall to Sentry.

42.    Had Sentry determined and applied to its costs of insurance rates based only on its expectations as to future mortality experience, the cost of insurance rates applied to Sentry policies would have be lower than they were years ago at the inception of the policies.

43.    Sentry has nevertheless vastly increased its COI charges to Plaintiff and members of the Class.

44.    These increases are not attributable to a verifiable, material adverse change in underlying mortality rates as required by the policies, but rather to Sentry's impermissible effort to recoup prior losses, offset its interest expense, and to cause policyholders to surrender or lapse their policies. Plaintiff has been and continues to be damaged by Sentry's unjustifiable monthly deduction increases.

45.    Plaintiff and many other class members are now required to pay much higher premiums to maintain the same level of coverage under the Policies such that their Policies will become cost-prohibitive if the monthly deduction increase is not enjoined. Unless stopped, Sentry will induce policyholders to surrender their Policies for the current cash value.

46.    These widespread terminations—also known as "shock lapses"—will in turn benefit Sentry because it will not have to pay out the death benefits on Policies for which Plaintiff and Class Members have duly paid the premiums for decades.

47.    On the other hand, the necessity of older Class members allowing their policies to lapse in the wake of increased monthly deductions from the cash value of the policies leaves class members with very few options: many are too advanced in age to secure another life

insurance policy and insurance companies do not typically offer universal life policies any more.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff seeks certification of the following class:

> All persons who own or owned a Sentry universal life insurance product and have been subjected to Sentry's impermissible increases in the cost of insurance.

49.    Excluded from the classes are (1) any Judge or Magistrate Judge presiding over this action and their family members; (2) Sentry, and its corporate parents, subsidiaries and affiliates, officers and directors, and any entity in which Sentry has a controlling interest; (3) persons who properly and timely request to be excluded; and (4) the legal representatives, successors, or assigns of any such excluded persons or entities. Plaintiff anticipates the need to potentially amend the class definition after discovery.

50.    There are thousands of members of the class described in the foregoing paragraph. Accordingly, the proposed class is so numerous that joinder of all members is impracticable. Although the exact number of members is unknown to Plaintiff at this time, the identities and addresses of the members of the class can be readily determined from business records maintained by Sentry.

51.    Plaintiff's claims are typical to those belong to class members. Plaintiff's claims stem from Sentry's impermissible premium and monthly deduction increases.

52.    Plaintiff will also fairly and adequately protect the interests of the Class Members, and has retained counsel experienced in complex class action litigation. Plaintiff and her counsel have no interests which are adverse to those belong to the Class Members that they seeks to represent.

A.    **Rule 23(b)(1)**

53.    Class action status is warranted under Rule 23(b)(1)(A). Prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

54.    Class action status is also warranted under Rule 23(b)(1)(B). Prosecuting separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests

**B.    Rule 23(b)(2)**

55.    This action is appropriate as a class action pursuant to Rule 23 (b)(2). Plaintiff seeks injunctive relief and corresponding declaratory relief for the Class. Sentry has acted in a manner generally applicable to each member of the Class by imposing the monthly deduction and premium increases on all Policies owned by Class members.

56.    Sentry's unlawful monthly deduction increases, if not enjoined, will subject Plaintiff and Class Members to enormous continuing future harm and will cause irreparable injuries to such Policyholders, who are compelled to surrender valuable life insurance policies with no economically viable option for alternative life insurance. The adverse financial impact of Sentry's unlawful actions is continuing and, unless preliminarily and permanently enjoined, will continue to irreparably injure Plaintiff and the Class.

**C.    Rule 23(b)(3)**

57.    This action is also appropriate as a class action pursuant to Federal Rule of Civil Procedure 23 (b)(3). Common questions of law and fact predominate over any individualized

questions. Common legal and factual questions include the following:

  a.   Whether Sentry's increases in monthly deductions are authorized under the terms of the Policies;

  b.   Whether Sentry breached its contractual obligations owed to Plaintiff and the Class;

  c.   Whether Sentry breached its implied duty of good faith and fair dealing owed to Plaintiff and the Class;

  f.   Whether Plaintiff and the Class have been damaged, and if so, whether they are eligible for and entitled to compensatory and punitive damages;

  g.   Whether Plaintiff and the Class are entitled to declaratory relief; and

  h.   Whether Plaintiff and the Class are entitled to preliminary or permanent injunctive relief, or other equitable relief, against Sentry.

  58.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

  a.   Given the age of class members, many of whom are elderly and have limited resources, the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that Sentry has committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

  b.   Once Sentry's liability has been adjudicated, claims of all class members can be determined by the Court;

  c.   This action will ensure an orderly and expeditious administration of the class's claims and will foster economies of time, effort, and expense, and ensure uniformity of decisions and compliance by Sentry with the Policies;

  d.   Without a class action, many class members would continue to suffer injury, and Sentry's violations of law will continue without redress while it continues to reap and retain the substantial proceeds and reductions in its future liabilities derived from its wrongful conduct; and

  e.   This action does not present any undue difficulties that would impede its management by the Court as a class action.

  59.   A class action is superior to other available means for the fair and efficient

adjudication of this controversy for other reasons as well. The injuries suffered by individual class members are, though important to them, relatively small compared to the burden and expense of individual prosecution needed to address Sentry's conduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

60.    Plaintiff cannot be certain of the form and manner of proposed notice to class members until the class is finally defined and discovery is completed regarding the identity of class members. Plaintiff anticipates, however, that notice by mail will be given to class members who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases and in similar communications in a way that is targeted to reach class members. The cost of notice, after class certification, trial, or settlement before trial, should be borne by Sentry.

61.    Plaintiff reserves the right to modify or amend the definition of the proposed class at any time before the class is certified by the Court.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

62.    Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

63.    Plaintiff brings this claim on behalf of herself and on behalf of the Class.

64.    The Policies are valid, enforceable contracts between Plaintiff and other Class members and Sentry.

65.    At all relevant times, Plaintiff and the Class have paid premiums to Sentry through monthly deduction charges established at the inception of the Policies, and have otherwise performed all their obligations under the Policies.

66.    Defendant Sentry agreed to a guaranteed interest rate for the cash value of the policy. Specifically, the policy states: "The guaranteed interest rate applied in the calculation is applied on a daily basis, at a daily rate, which is equivalent to an **effective annual rate of 5%.**" Exhibit A at 11 (emphasis added).

67.    Through the COI increase, Sentry has materially breached the terms and provisions of the Policies for reasons not permitted under the Policies; that is, in order to reduce its credited interest obligations to Plaintiff. Sentry may not directly offset its guaranteed interest rate by increasing the COI. By doing so, it is denying Plaintiff the benefit of the guaranteed interest rate.

68.    Furthermore, by increasing the COI and deducting more money from the cash value of the policy, Sentry is removing extra additional money from Plaintiff's cash value that would otherwise be earning 5% interest.

69.    Sentry also breached the contract by increasing the cost of insurance for reasons other than its "expectations as to future mortality experience." If anything, its expectations of future mortality experience improved. Nevertheless, Sentry dramatically increased the COI.

70.    By calculating the COI with reference to factors other than "expectations as to future mortality experience," such as its interest obligations to Plaintiff and the Class, past losses, and also its own future profit, Sentry breached the clear language of the contract describing how the monthly deduction, the COI, and the mortality rate were to be calculated.

71.    Sentry's conduct and material breaches of the Policies have proximately caused

damage to Plaintiff and the Class in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

72.    Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

73.    A duty of good faith and fair dealing is an implied condition in every contract and imposes a duty of cooperation on the part of both parties and an obligation to act honestly.

74.    Under the implied covenant, no party to a contract is to take opportunistic advantage of another party in a way that could not have been contemplated at the time of drafting.

75.    There is likewise an implied promise on the part of each party not to take action intentionally and purposefully that will prevent the other party from carrying out his side of the agreement or from obtaining the benefits of the contract. A party breaches the duty of good faith and fair dealing when its actions have the effect of "injuring or destroying" the ability of the other party to receive the benefits of the contract.

76.    In the event that any breach alleged herein is not explicitly covered by the terms of the contract, Sentry has breached the implied covenant of good faith and fair dealing by the conduct alleged above.

77.    Sentry acted in bad faith and breached the implied covenant of good faith and fair dealing by, among other things:

   a.    Exercising its discretion to increase the monthly deductions to drain the cash value of Plaintiff's policy such that she would have less capital earning a guaranteed interest rate of 5%;

   b.    Increasing the COI with the intent of causing Plaintiff and other Class members to allow their Policies to lapse and/or to surrender their Policies, so that Sentry

would have received the benefit of years of premium payments while completely avoiding paying out the death benefit;

c.   Dramatically increasing the COI to elderly policyholders it should have known were living on a fixed income;

d.   Negating and/or offsetting the value of guaranteed interest rates on cash value; and

e.   Taking into consideration its own profits and past losses in raising the COI, despite its representations that it "will determine the current mortality rates based on our expectations as to future mortality experience".

78.   Sentry is taking opportunistic advantage of Plaintiff and the Class, who had dutifully paid premiums for years and by engaging in the above conduct with the purpose of wrongfully inducing forfeiture of death benefits among primarily elderly policyholders.

79.   Sentry engaged in the above conduct with the design to unfairly frustrate the agreed common purposes of the Policy and to disappoint Plaintiff's reasonable expectations by denying Plaintiff the benefits of her Policy. Plaintiff reasonably expected, among other things, (1) to continue to be able to afford paying her premiums in her old age, just as she had done for the 30 years prior; (2) that her "flexible premium" insurance policy allowed her to make minimal premium payments at times (when in reality, Sentry raised COI so much the premiums it charged did not cover monthly deductions from the cash value of the policy); (3) Sentry would not give with one hand guaranteed interest on the cash value of her policy, while with the other decimating the cash value of her policy through increased COI and premiums; and (4) Sentry would not try to edge her out of her policy (and death benefit) through increased COI after paying her premiums for 30 years.

80.   As such, Sentry has denied Plaintiff the benefit of the bargain it struck with Plaintiff in May of 1989.

**THIRD CLAIM FOR RELIEF**

## DECLARATORY RELIEF

81.    Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

82.    Plaintiff brings this claim on behalf of herself and on behalf of the class.

83.    An actual controversy has arisen and now exists between Plaintiff and the Class Members, on the one hand, and Sentry, on the other hand, concerning the respective rights and duties of the parties under the Policies.

84.    Sentry contends that it lawfully and appropriately increased monthly deductions, the cost of insurance, and mortality rates, has appropriately collected (and is still collecting) monthly deduction based on the elevated COI, and that it is permitted to continue to collect these charges for the duration of the Policies.

85.    On the other hand, Plaintiff and the Class maintain that Sentry, through its monthly deduction and premium increases, has inappropriately and unlawfully, in material breach of the express and implied terms of the Policies, collected inflated monthly deduction charges.

86.    Plaintiff, on behalf of herself and the Class, seeks a declaration as to the Parties' respective rights under the Policies and requests the Court to declare that the monthly deduction, COI, and mortality rate increase is unlawful and in material breach of the Policies' terms so that future controversies may be avoided.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

a)    An Order certifying this action to proceed on behalf of the Class and appointing Plaintiff and her counsel listed below to represent the Class;

b)    An Order awarding Plaintiff and Class members entitled to such relief restitution

and/or disgorgement and such other equitable relief as the Court deems proper;

c) An Order enjoining Sentry, its representatives, and all others acting with it or on its behalf from unlawfully charging excessive monthly deductions from Plaintiff and the Class's cash value and requiring those deductions to be consistent with the terms of the policies, and other appropriate injunctive relief;

d) An Order providing preliminary and permanent injunctive relief enjoining Sentry, its representatives, and all others acting with it or on its behalf, from terminating Policies while Sentry imposes impermissible COI increases;

e) An Order providing a declaration that the monthly deduction, COI, and mortality rate increases materially breach the Policies, and that Sentry must determine the monthly deductions only on the grounds authorized under the Policies;

f) An Order awarding Plaintiff and other Class members who might be entitled to such relief actual, compensatory, statutory, punitive, and/or exemplary damages;

g) An Order awarding Plaintiff attorneys' fees and other costs; and

h) An Order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b), Plaintiff and the Class demand a trial by jury.

Dated: May 18, 2018                    Respectfully submitted,

By: _____

Thomas W. Kyle
**HUPY AND ABRAHAM, S.C., P.C.**
111 East Kilbourn Avenue
Suite 1100
Milwaukee, WI 53202
Telephone: (414) 223-4800
Facsimile: (414) 271-3374
Email: TKyle@hupy.com

By: _/s/ Stephen J. Fearon, Jr._____
Stephen J. Fearon, Jr (subject to *pro hac vice*)
Raymond N. Barto (subject to *pro hac vice*)
**SQUITIERI & FEARON, LLP**

21

32 East 57th St., 12th Floor
New York, New NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: raymond@sfclasslaw.com

**Attorneys for Plaintiff and the Proposed Class**